UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CHERYL DOMMES,

                Plaintiff,

  -against-                                                                3:12-CV-0627 (LEK)

CAROLYN W. COLVIN, Commissioner
Social Security Administration,[1]

                Defendant.

## MEMORANDUM-DECISION and ORDER

**I.    INTRODUCTION**

Before the Court is an action for judicial review, pursuant to General Order 18 of the United States District Court for the Northern District of New York, of the Social Security Administration's ("SSA") denial of Plaintiff Cheryl Dommes's ("Plaintiff") application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Both parties have filed Briefs. Dkt. Nos. 16 ("Plaintiff's Brief"); 17 ("Defendant's Brief"). Plaintiff also filed a Reply. Dkt. No. 18-1 ("Reply"); see also Dkt. No. 21. For the reasons discussed below, the SSA's decision is reversed, and Plaintiff's claim is remanded for a new hearing.

**II.    BACKGROUND**

**A. Procedural Posture**

Plaintiff's challenge is limited to back-dated benefits for the period between August 10, 2005, the specified date of onset in Plaintiff's first application for benefits, which was denied, and

---

[1] On February 14, 2013, Carolyn W. Colvin took office as Acting Social Security Commisioner, replacing Michael Astrue. She has been substituted as the named Defendant in this matter pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

June 1, 2008, the date specified in her second application, which was granted. See Pl.'s Br. at 1. Plaintiff's first application—which is the only application in the Record—includes a Title XVI claim for SSI as well as a Title II claim for DIB. See, e.g., Dkt. No. 9 ("Record") at 5. Both claims were denied on April 5, 2006, and were denied again upon reconsideration. See R. at 33-34. Plaintiff requested and was granted a hearing in Binghamton, New York, at which the Administrative Law Judge ("ALJ") presided remotely. R. at 20. The ALJ issued an unfavorable decision on April 25, 2008, R. at 10-18, and Plaintiff's request for review was denied by the Appeals Council on May 27, 2008. R. at 3.

Plaintiff brought a civil action in the Northern District of New York, which reversed and remanded the matter for further proceedings on stipulation of the parties.[2] R. at 209. Meanwhile, Plaintiff successfully filed additional claims for benefits and was found to have been disabled as of the new alleged onset date of June 1, 2008.[3] Id.

The Appeals Council, in accordance with the district court's decision, vacated the final decision of the Commissioner of Social Security ("Commissioner"), and remanded the matter to an ALJ. R. at 210. The ALJ was to (1) evaluate the opinions of Plaintiff's treating physicians on Plaintiff's disability during the time between August 2005 and June 2008 ("Disputed Period"); (2) explain how the medical evidence supports his residual functional capacity ("RFC") assessment, reconciling the opinions of the consultative examiner and the treating physicians; (3) determine whether Plaintiff was engaged in substantial gainful activity during the Disputed Period. Id.

---

[2] See 42 U.S.C. §§ 205(g) (providing a right of review of Title II DIB claims); 1383(c) (providing a right of review of Title XVI SSI claims).

[3] Plaintiff's second application for benefits and favorable decision are not in the Record.

2

On remand, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2013,[4] and that Plaintiff did not engage in substantial gainful activity during the Disputed Period. R. at 173; 20 CFR §§ 404.1571, 416.971. The ALJ found that, during the Disputed Period, Plaintiff had lumbar spine herniated nucleus pulposus with an annular tear, a severe impairment under 20 CFR §§ 404.1520. R. at 174. However, the ALJ found that Plaintiff did not have an impairment (or a combination of impairments) that met or medically equaled one of the listed impairments. R. at 175.[5]

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, albeit with additional nonexertional postural limitations. R. at 176; 20 CFR §§ 404.1567(a); 416.967(a). In particular, the ALJ found that Plaintiff had the capacity to occasionally lift, carry, push, or pull 20-30 pounds and to frequently lift, carry, push, or pull 10 pounds, and to bend on occasion. R. at 176. Moreover, the ALJ found that in an eight-hour workday Plaintiff could, with normal breaks, stand or walk for four hours, and sit for six hours. Id.

Next, the ALJ found that Plaintiff was capable of performing past relevant work as a document-and-imaging processor during the period in question. R. at 183. Based on these findings, the ALJ concluded that Plaintiff was not disabled during the Disputed Period. R. at 184. The Appeals Council declined to review the decision. R. at 1-6. Plaintiff then filed this action for judicial review.

**B. Treatment History**

Plaintiff suffered a work-related injury on July 7, 2005, while she was lifting cases of metal

---

[4] See 20 CFR § 404.131.

[5] See 20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.925, 416.926.

parts. See R. at 174. Plaintiff initially felt increased pain in her right leg, and denied having pain in her lower back. See R. at 96. At the time, she was working as an assembler engaged in shipping and receiving at Akraturn. See R. at 67. About one month later, Plaintiff terminated employment at the direction of her doctor. Id.

Plaintiff initially sought treatment for her injury from the Barnes Kasson Medical Center in Hallstead, Pennsylvania.[6] Plaintiff reported abdominal pain and lower back pain that extended to her right leg. R. at 87-91. Although Plaintiff's pain lessened somewhat over time, she continued to experience pain through the duration of her visits between September and December of 2005. See R. at 90-91. Plaintiff was prescribed 100mg of Darvocet to treat pain. R. at 91.

Plaintiff began to see neurosurgeon Dr. Daniel D. Galyon in early 2006 for further evaluation. R. at 100. Dr. Galyon stated that Plaintiff's "[l]umbar movements [were] a bit guarded in terms of extremes of extension and foward flexion, but she can accomplish these without radiation down the leg of any pain." R. at 101. Dr. Galyon rated Plaintiff's strengths in her "all tested muscle groups" as a "5/6." Dr. Galyon attributed Plaintiff's injuries to "degenerative changes in the lumbar spine," and recommended a resumption of physical therapy—which Plaintiff had previously attempted—rather than neurosurgical intervention. Id. Dr. Galyon maintained this opinion through his treatment of Plaintiff in April of 2007, see R. at 123, despite Plaintiff's failure to respond to physical therapy. See R. at 142.

While Plaintiff was also applying for Worker's Compensation, she was referred to consultative examiner Dr. Steven Salsburg for an orthopedic evaluation. R. at 109. Dr. Salsburg

---

[6] It is not clear what doctor examined Plaintiff, if any. Plaintiff's records were signed and released by Eleanor Conroy, a Nurse Practitioner. See R. at 86-96

4

stated that Plaintiff was tearful and appeared to be in acute pain on the date of the examination. R. at 110. The pain had become "increasingly severe," "sharp," and was "present everyday and did not stop." R. at 109. Dr. Salsburg observed Plaintiff's gait to be "guarded and broad based" and her station to be "normal" without assistive device. R. at 110. Plaintiff could perform a "full squat while holding onto the desk," "needed no help changing," and "was able to rise from [her] chair holding onto the table." Id. However, Plaintiff "needed some help getting up and off the examining table." Dr. Salsburg diagnosed Plaintiff to have a "narrow[ing]" of "disc space" and a "lumbar disk herniation by history with radiation." Id. Dr. Salsburg concluded that Plaintiff "ha[d] moderate to severe difficulty at present in climbing stairs, bending, lifting, carrying, and kneeling." R. at 112. Dr. Salsburg doubted Plaintiff's ability to lift heavy objects, and stated that Plaintiff could sit and stand "for short periods of time." Id. Plaintiff's prognosis was "fair." Id.

After Plaintiff did not improve, her new primary care physician, Dr. Sanjiv A. Patel, conducted an MRI in June of 2006 that revealed, *inter alia*, a "central posterior annular tear and left paracentral disc herniation," and an "impinged" "left exiting L-5 nerve root." R. at 135. Prior to the MRI, Dr. Patel had treated Plaintiff's pain with Darvocet, "which ha[d] not been effective in relieving her pain." R. at 376. Dr. Patel discontinued Darvocet, prescribed Vicodin, and started Plaintiff on physical therapy. R. at 374-75. This treatment decreased Plaintiff's pain to "5/10 instead of 9/10," but Plaintiff continued to report "sharp pain, still in her lower back with apparently no radiation." R. at 374.

Following the June 2006 MRI, Plaintiff sought a second neurological opinion from Dr. Khalid A. Sethi. See R. at 122. Dr. Sethi recommended injection therapy and pain management to Plaintiff, noting that "the natural history of surgical stabilization for purely mechanical axial

5

discomfort unfortunately has not been particularly meritorious and should remain a last resort." Id. Dr. Sethi referred Plaintiff to Dr. Xiao Fang, who began treating Plaintiff on August 14, 2007. R. at 142. Dr. Fang noted that prior treatment—including epidural injection, physical therapy, Vicodin, diclofenac, and another muscle relaxer—was not effective. Id. Dr. Fang observed Plaintiff's gait was "slow," her lumbar range of motion was "within functional limits but with pain," and she was experiencing decreased sensation and "severe tenderness in the lumbar paraspinal region." R. at 143 Dr. Fang initially prescribed another drug, Lyrica, for nerve pain, but Plaintiff was "reluctant to have another injection" "because of the reaction that she had before." Id. On follow-up visits, Dr. Fang "limited [Plaintiff's] lifting maximum to 5 pounds" and added new and increased doses of pain medication. R at 140. Plaintiff's condition continued to worsen, although she began to work again from late 2007 to early 2008. R. at 139. On March 13, 2008, Dr. Fang requested another MRI, finding "bilateral spondylolysis," a "quite severe narrowing . . . of the left L5 neural foramen," and lateral disc bulge. R. at 137. On subsequent visits, Dr. Fang treated Plaintiff with a second epidural injection, R. at 398, and although Plaintiff experienced short-term relief, she ultimately needed to cut down her work hours from normal, eight-hour days to 13 hours per week. See R. at 395-97. As of September 2009, Plaintiff's condition had still not improved, although Plaintiff was not ready to commit to surgery. See R. at 387.

**C. Consultative Medical Examiner Testimony**

At the rehearing on September 29, 2010, continuing on March 14, 2011, consultative medical examiner Dr. Donald Ira Goldman testified by phone. See R. at 434, 482. Dr. Goldman testified that inconsistencies within the medical evidence informed his opinion that Plaintiff's symptoms did not meet or equal a medical impairment. Id. at 442-44. Dr. Goldman opined that the

June 2006 "MRI indicates that [Plaintiff] has two different kinds of problems in the same spine. One is a herniated disk and one is an annular tear." R. at 443. Dr. Goldman did not understand why surgery was not seriously considered until years after Plaintiff's injury, as her conditions likely could have been treated by certain surgical procedures. Id. In addition, he failed the identify the basis for Drs. Galyon's, Sethi's, and Fang's evaluations, which Dr. Goldman found to be problematic. R. at 444-45. For example, in contrast to their findings regarding Plaintiff's lifting capabilities, he found that, "with no injury to her hand[s,] . . . wrist[s,] . . . elbow[s], neck [or] shoulders, her grip strength normally would be easily 40, 50 pounds. So there's no reason she couldn't handle 20, 25, 30 pounds." R. at 445.

He noted, in addition, that there is no assessment in the Record regarding Plaintiff's abilities to walk and go up and down stairs, which are easily observable and can be checked in an office visit. Id. Moreover, where other assessments were conducted, Plaintiff was reported as being able to do a full squat, needing no help dressing, and needing no help getting on and off the examination table. R. at 446. These abilities, Dr. Goldman found, are inconsistent with the noted limitations of Plaintiff's spinal movement recorded in the medical opinions. Id. He therefore concluded that Plaintiff may have some limitations but could still work. Id. Dr. Goldman found troubling the lack of objective clinical findings that might be expected of someone with difficulty standing, bending, and walking, such as "atrophy, weakness, deep tendon reflex, changes in positive tension signs, a loss of motion, or spasm." R. at 445.

With regard to sitting and standing, Dr. Goldman posited that "[t]here's no reason that she can't sit for at least four to six hours in an eight hour day," and stand and walk for a combined four hours. R. at 446. Also, Dr. Goldman found that Plaintiff could push, pull, lift, and carry between

7

twenty and thirty pounds.  Id.  Bending would be restricted and done only occasionally.  R. at 446-47.  He noted, in addition, that when asked if she had ever worn a back brace, Plaintiff replied that she had not—the implication being that Dr. Goldman might expect someone with her conditions, if debilitating to the point where the person could no longer work, to wear or to have worn a back brace at some point.  R. at 447.

Dr. Goldman further testified that, with regard to the opinion of Dr. Fang, there is "virtually no examination" and Dr. Fang's findings are based instead "upon symptomatic assessment."  Id. at 449.  Dr. Goldman found Dr. Fang's opinion not to be compelling absent any objective clinical findings to substantiate it.  Id.

The ALJ explained to Dr. Goldman that, on remand, the ALJ was instructed to more closely examine the opinion of Dr. Salsburg and asked Dr. Goldman to weigh in.  R. at 450.  Dr. Goldman remarked that "apart from [Dr. Salzberg's] subjective assessment, some of the actual examination doesn't justify what he's saying."  R. at 451.  Dr. Goldman explained that, if Plaintiff's condition was actually "moderate to severe [he] would expect to find significant, objective findings, which are easily ascertained [upon examination of] the patient."  R. at 452.

As far as the impression by Dr. Sethi, Dr. Goldman noted that he does not disagree with its accuracy but questions its significance "from a functional point of view."  R. at 457.  In addition, Dr. Goldman stated that if a patient showed signs of spinal narrowing, "somebody would have had her undergo UMG and nerve conduction studies."  R. at 456.  Dr. Goldman further opined that Plaintiff's spondylolisthesis could not have been caused by her accident, because "[i]f it [were], she wouldn't be walking in here."  Id.   Instead, he posited that Plaintiff had this condition from birth, and thus it was not the major cause of Plaintiff's loss of ability—although he did note that

8

aggravation of the condition is possible. Id.

Ultimately, when asked whether Plaintiff's conditions were capable of causing an amount of pain that might prevent someone from working, Dr. Goldman testified that many people have her conditions and never have a problem, while others are rendered incapable of working. R. at 463.

## III. LEGAL STANDARD

### A. Standard for Benefits

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 423(d)(1)(a). Moreover, a plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

In determining whether a plaintiff has a disability, the Commissioner applies a five-step process. See 20 C.F.R. §§ 404.1520 and 416.920. Moreover, "[i]f at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." Barnhart v. Thomas, 540 U.S. 20, 24 (2003). The five-step process is as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he [or she] is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him [or her] disabled without considering vocational factors

9

such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

Bush v. Shalala, 94 F.3d 40, 44-45 (2nd Cir. 1996) (citations omitted). The plaintiff bears the burden of proof with regard to the first four steps; the Commissioner bears the burden on the fifth step. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).

**B. Standard of Review**

In reviewing an SSA decision, a court's role is to determine whether the ALJ's findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); Featherly v. Astrue, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. of New York v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. Featherly, 793 F. Supp. 2d at 630.

The reviewing court should not affirm an ALJ's decision if it reasonably doubts that the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986. If the ALJ applied the correct legal standards, the decision must be upheld if the evidence is deemed to be susceptible to more than one rational interpretation, and must be sustained "even where substantial evidence may [also] support the plaintiff's position." See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982); Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). The reviewing court may not determine *de novo*

whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). It must afford the SSA's determination considerable deference and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

### IV. DISCUSSION

Plaintiff asserts that the "ALJ committed prejudicial error by not affording substantial, if not controlling weight to the treating physician[s]" because "the opinions of the treating physicians and consulting physicians were consistent with one another, were consistent with the findings of the consultative examining physician, were consistent with [Plaintiff's] testimony, and were consistent with the objective and subjective complaints of record." Pl.'s Br. at 7. Plaintiff argues that "[t]he ALJ essentially discredited . . . [the opinions of the treating physicians] based almost entirely on the opinion of Dr. Goldberg—a physician who never examined [Plaintiff], never treated her, reviewed her records on a single occasion and . . . [whose opinion] was riddled with error." Id. at 9.

Defendant asserts that the ALJ "offered a reasonable basis for how he resolved evidentiary conflicts, and his weighing of the medical source opinions of record was adequate to support his decision." Def.'s Br. at 6. Defendant further posits that "the ALJ decision extensively discussed the evidence of record and explained that Dr. Fang's opinion was not well supported." Id. at 7. For the following reasons, the Court finds that the ALJ gave improper weight to the treating physicians' opinions, which constitutes reversible error.

The "treating physician rule" provides that "an ALJ must give controlling weight to the treating physician's opinion when the opinion is 'well-supported by medically acceptable clinical

11

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Weather v. Astrue, No. 11–CV–00890, 2012 WL 6725858, at *3 (N.D.N.Y Dec. 27, 2012) (quoting 20 C.F.R. § 404.1527(d)(2)); see Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).

Defendant asserts that the opinion of Dr. Fang was not given controlling weight "due to the lack of objective findings and other evidence of record." Def.'s Br. at 8. But the Second Circuit has held that a lack of specific clinical findings, without more, does not allow an ALJ to discredit the opinion of a treating physician. See Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir.1998); Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998). To the extent that the ALJ relied on Dr. Goldman's assertions that the record was insufficient, it was her "affirmative obligation to develop the administrative record. This duty exists even when the claimant is represented by counsel." Clark, 143 F.3d at 118 (quoting Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)). Regardless, the findings of the various treating and consultative physicians are generally consistent. For example, multiple doctors and examiners found and agreed on the following assessments and diagnoses: spondylolysis and/or spondylolisthesis, R. at 112, 385, 405, 455-56; disc herniation and annular tear, R. at 372, 443; foraminal narrowing at the L5 level that is worse on the left side than the right, R. at 112, 372, 385; disc bulging, R. at 372, 385; a limitation of sitting and standing for thirty minutes at a time, R. at 109-12, 409-10; and a limited ability to bend, R. at 112, 385, 446-47.

While Dr. Goldman expressed uncertainty regarding some of the other medical opinions in this case, he acknowledged that Plaintiff's impairments could limit her lifting ability to five pounds, could cause pain, and could affect concentration and limit work pace. R. at 488. This is consistent with the other medical opinions and with Plaintiff's testimony. Moreover, Dr. Goldman testified

12

that while Plaintiff's conditions do not present any significant difficulties in some people, they would render others unable to work. R. at 463. The ALJ does not assert that the diagnostic techniques used by the treating physicians were not medically accepted, nor is there substantial evidence to support such a conclusion. See generally R. at 170-185.

With regard to treating the relationship, most of Plaintiff's treating physicians saw her on multiple occasions. See 20 CFR § 404.1527(c)(2)(I). The treating physicians were knowledgeable about Plaintiff's impairments because they were specialists in their respective fields of medicine, and treated Plaintiff for the aspects of her conditions for which they were most qualified according to their specialties. See R. at 458-59, 467-68; 20 CFR § 404.1527(c)(2)(ii); 20 CFR § 404.1527(c)(5). The opinions are well supported and sufficiently explained. See 20 CFR § 404.1527(c)(3). Furthermore, the opinions are generally consistent with the record as a whole. See 20 CFR § 404.1527(c)(4).

The ALJ stated that she accorded "some" weight to the medical opinions of Drs. Fang, Sethi, and Salsburg, though it was "considerably less weight" than the opinion of Dr. Goldman. R. at 183. Yet it is not clear that the ALJ gave these opinions any weight at all. Even if the ALJ did rely on the treating physicians' opinions to some extent, it is unclear how much weight was assigned to particular portions. Failure to properly weigh treating physicians' opinions, reconcile the testifying consultative examiner's opinion with the evidence in the Record, and affirmatively investigate remaining inconsistencies in the record constitutes reversible error and requires remand.[7]

---

[7] Because the Court finds reversible error in the weight assigned to the treating physicians' opinions, the Court need not address the thorny issue of whether the rules on telephonic testimony at the time allowed the ALJ to receive and assign weight to a consultive examiner testifying by telephone, and whether or not any putative error was harmless.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **VACATED** and Plaintiff's claim is **REMANDED** to the SSA for a new hearing consistent with the Memorandum-Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties.

**IT IS SO ORDERED**.

DATED: January 29, 2014
Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge